**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KYLE CARTER** <br><br>                          **Plaintiff,** <br><br><br>      **v.** <br><br><br> **THE DEVEREUX FOUNDATION d/b/a DEVEREUX ADVANCED BEHAVIORAL HEALTH – PA CIDDS** <br><br><br>                          **Defendant.** | **Civil Action No. 2:21-CV-04437** |

**<u>MEMORANDUM OPINION</u>**

**Goldberg, J.**                                                              **January 24, 2024**

       Kyle Carter ("Plaintiff") has sued his former employer, the Devereux Foundation d/b/a Devereux Foundation Advanced Behavioral Health – PA CIDDS ("Defendant"), for discrimination and unlawful retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). Plaintiff claims that he was: (1) discriminated against during his employment because of his race, which ultimately led to his termination, and (2) retaliated against for reporting discriminatory conduct.  Defendant now moves for summary judgment. For the foregoing reasons, Defendant's motion will be granted in its entirety.

**I.       STATEMENT OF FACTS**

       The following facts are derived from the evidence submitted by the parties. Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view such evidence in the light most favorable to Plaintiff. The following record is derived from

Defendant's Statement of Facts (ECF No. 17 ("MSJ"), Ex. A, Statement of Undisputed Material Facts ("SOF")), together with exhibits of record and supplemented with Plaintiff's Response to the SOF (ECF No. 20 ("Resp. to MSJ"), Ex. A ("Resp. to SOF")). Most of the facts set forth below are uncontested. [1] The parties' factual disagreements are noted where relevant.

### A. The Parties

Defendant Devereux provides a variety of assessment, treatment, and educational services to children, adolescents, and young adults with diagnoses of developmental and intellectual disabilities and autism spectrum disorders nationwide. (MSJ, Ex. B, Dep. of Richard Latella ("Latella Dep.") 11:21–24; 12:1–5.) Defendant serves its clients by offering two distinct residential care programs: (1) the Autism Spectrum Disorder program ("ASD"), and (2) the Intellectual Disability Mental Health program ("IDMH"). (MSJ, Ex. C, March 12, 2019 Offer Letter; MSJ, Ex. D, Dep. of Edward Vincent ("Vincent Dep.") 14:12–15:3; Latella Dep. 12:1–16.).

Plaintiff Kyle Carter, who is African-American, was hired on or about April 8, 2019, as a program director for Defendant's IDMH program. (MSJ, Ex. C, March 12, 2019 Offer Letter.) Program directors are responsible for overseeing "all aspects of the program including scheduling, staffing, programmatic effectiveness" and ensuring client safety. (MSJ, Ex. E, Dep. of Kyle Carter ("Pl. Dep.") 61:19–62:2.)

### B. Other Individuals Employed by Defendant

Plaintiff reported directly to Administrator of Residential Services Edward Vincent ("Vincent"), who Plaintiff identified as being African-American. Vincent has been employed at

---

[1]     If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the supporting exhibits. If a statement is disputed, but the dispute cannot be resolved by reference to the exhibits, I will note the dispute. I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

Devereux for approximately twenty-five years in various positions, including Program Manager. (Latella Dep. 16:11–19); (Vincent Dep. 10:2–11:4); (Pl. Dep. 63:10–15, 91:12–14.) Carol Anne McNelis ("McNelis") was the Executive Director at Devereux. (SOF at ¶ 41.) Caroline Gathura ("Gathura") was a manager in Defendant's human resources department ("HR"). (SOF at ¶¶ 17, 37.) Richard Latella ("Latella") was the Director of HR. (SOF at ¶ 19.)

### C. Defendant's ASD and IDMH Programs

The differences between the two programs offered by Defendant, ASD and IDMH, are central to Plaintiff's claims. Plaintiff was a program director in the IDMH division. In that role, he supervised four program managers, one program coordinator, and one operations manager, who together collectively oversaw treatment for approximately eighty to one hundred clients. (Latella Dep., 33:3–10); (Vincent Dep. 26:5–13); (Pl. Dep. 64:2–65:14.) Plaintiff also "indirectly supervised" direct care staff. (Pl. Dep. 64:2–65:14.) The majority of clients in the IDMH program were African-American. (Id. 74:14–75:5).

In contrast, the ASD program was larger; it had several hundred clients and was overseen by two program directors instead of one. (Latella Dep. 38:17–19; 39:3–5; Pl. Dep. 75:1–18.) When Plaintiff was hired, the two directors for the ASD program were Donna Gonzalez ("Gonzalez"), a white woman, and Anthony Fusco ("Fusco"), a white man. (Vincent Dep. 31:1–22, 112:3–7); (Latella Dep. 104:15–105:9.) In January 2020, Gonzalez was replaced by Deanna Thetford ("Thetford"), an African-American woman. (Pl. Dep. 76:20–77:19.) The majority of clients in the ASD program were Caucasian. (Resp. to SOF at ¶¶ 55–56.)

Plaintiff claims that both IDMH and ASD had staffing issues that predated Plaintiff's hiring. (Pl. Dep. 78:13–79:6); (SOF at ¶ 47.) Both programs had the same number of clients assigned to a particular staff member. (Pl. Dep. 80:23–81:5.)

3

### D. Plaintiff's Claims of Discrimination

Plaintiff's factual allegations as they specifically pertain to his claims of discrimination are as follows:

- Plaintiff received multiple disciplinary actions related to his failure to ensure that his direct reports' treatment records were compliant. (MSJ, Ex. H, "Record of Disciplinary Action"); (MSJ, Ex. L, "Record of Disciplinary Action, 7/7/2020"); (MSJ, Ex. M, "Record of Disciplinary Action, 7/20/2020.") Plaintiff alleges that ASD program directors Fusco and Gonzalez had direct reports that were also non-compliant. (MSJ, Ex. I, "Grievance Request-Kyle Carter.") Plaintiff points out that neither director was disciplined or terminated for this reason and that both directors are white and outside of Plaintiff's protected class. (Resp. to SOF, Ex. C, Dep. of Richard Latella ("Latella Dep.") 104:6–105:24); (Id. at 104:6–105:9.)

- Plaintiff alleges IDMH should have been provided more staffing than ASD because of serious client behavioral issues, like aggression. (Pl. Dep. at 80:7–22.) Plaintiff claims ASD received better staffing support than IDMH, but acknowledges ASD had more clients than IDMH. (Id. at 75:15–18, 77:23–12, 79:7–80:6.)

- A program coordinator position for IDMH was not filled for several months. (Id. at. 82:1–10.) To provide coverage while the position was being filled, other staff members were called in to help. (Id. at 82:20–83:17.) There were also IDMH clinician vacancies "for a period of time." (Id. at 100:21–101:7.)

- Plaintiff was informed by unidentified staff members that the national level administrators provided ASD with more staffing incentives and resources than IDMH. (Id. at 84:10–85:17.)  ASD was provided with more games and supplies for clients. (Id. at 86:4–87:1.)

Around July 2019, Plaintiff's requests for more games and supplies for IDMH were denied due to budget constraints. (<u>Id.</u> at 87:2–81:19.) In fall of 2019, the national office was concerned with an uptick in client behavioral issues and provided more resources to both IDMH and ASD. (<u>Id.</u> at 88:7–89:12.)

- In summer of 2019, Plaintiff had conversations with Charm Amadu ("Amadu"), a program coordinator, who stated that he also noticed the differences between the programs. (<u>Id.</u> at 98:17–99:24, 101:12–19); (SOF at ¶ 49.) Plaintiff perceived Amadu was complaining about racial discrimination but did not report the conversation to HR because Amadu requested the conversation remain "off-the-record." (Pl. Dep. 103:6–105:10.)

- In September 2019, Plaintiff spoke to his direct supervisor Vincent about his concerns with ASD receiving more programmatic support than IDMH. (<u>Id.</u> at 90:3–91:5.) On several occasions, Plaintiff told Vincent he perceived the differences between programs were based on race. (<u>Id.</u> at. 90:22–91:11, 94:23–95:21); (SOF at ¶ 46.) Plaintiff also expressed to a national office representative that he felt the differences in resources between the program were due to racial discrimination. (Pl. Dep. 96:17–98:7); (SOF at ¶ 49.) The national office representative indicated that they would investigate further. (Pl. Dep. 98:8–13.)

- In fall of 2019, Plaintiff expressed similar concerns to Caroline Gathura in HR but asked that the conversation remain "off-the-record." (<u>Id.</u> at 106:23–108:15); (SOF at ¶ 51.)

- On or about June 1, 2020, in response to the Philadelphia protests/riots, Executive Director McNellis stated "well they shouldn't be looting or rioting either" during a meeting. (Pl. Dep. 193:17–194:1); (SOF at ¶ 41.) After the meeting, Plaintiff told Vincent that the

comment seemed racially motivated because it was African-Americans that were participating in the rioting. (Pl. Dep. 195:17–196:9); (SOF at ¶¶ 42–43.)

- Shortly after, McNellis sent a "tone deaf and offensive" email "regarding providing support to those affected by the racial unrest by directing them to food banks." (Pl. Dep. 197:11–24); (SOF at ¶ 41.)

### E.  Plaintiff's Disciplinary Record

New employees are given a one-month grace period referred to as the "orientation period" to learn the processes and job expectations. (Vincent Dep. 28:22–29:12.) Vincent testified that there were issues with Plaintiff's performance after the orientation period. (Id. at 28:6–21.)

In August 2019, Vincent drafted a performance improvement plan because Plaintiff was not meeting performance expectations. (Id. at 36:10–23); (Pl. Dep., 125:21–24); (MSJ, Ex. F, "IDMH-Reviewing and closing the gaps in general Operations and Treatment.") Vincent met with Plaintiff to review the expectations outlined in the memo. (Id. at 36:24–37:10.) Specifically, by September 1, 2019, Plaintiff was ordered to improve his scheduling of staff and coordinating coverage for shifts. (MSJ, Ex. F, "IDMH-Reviewing and closing the gaps in general Operations and Treatment.") By October 1, 2019, Plaintiff needed to address numerous areas, including mastering Defendant's document management systems, managing direct reports and their caseload, providing "oversight on all IDMH schedules, general operations and treatment," and facilitating and implementing residential crisis and response plans. (Id.) Plaintiff signed off on the plan and raised no objections. (Vincent Dep. 37:10–15.) Plaintiff acknowledged that he understood

at the time that he received this document that his job performance needed to improve if he were to continue his employment. (Pl. Dep., 124:21–125:4.)

On December 2, 2019, Vincent issued Plaintiff a second "Memo of Concern" due to additional job performance issues. (Vincent Dep. 47:14–19); (Pl. Dep., 126:1–3); (MSJ, Ex. G, "Memo of Concern.") The memo set forth deadlines wherein Plaintiff needed to make specific improvements. (Id.) The memo stated that Plaintiff needed to provide structured supervision to his direct reports, resolve discrepancies in clients' records, develop a plan for consistent data collection, and ensure all procedures and employee practices were consistently followed by managers and staff on his caseload. (Id.); (Vincent Dep. 47:18–48:3.) The memo also included a description of job expectations for Plaintiff as a Program Director and stated that his failure to complete his job responsibilities would "lead to progressive discipline up to and including termination." (MSJ, Ex. G, "Memo of Concern.") Plaintiff acknowledged that by issuing the memo Vincent was "expressing his continued concerns" with Plaintiff's performance. (Pl. Dep., 127:3–6.)

On February 7, 2020, Vincent issued a written warning to Plaintiff because he failed to address the issues outlined in the memo of concern. (Vincent Dep. 51:18–23, 53:1–17); (MSJ, Ex. H, "Record of Disciplinary Action.") Specifically, Plaintiff failed to ensure that client treatment records complied with regulatory timelines. (MSJ, Ex. H, Record of Disciplinary Action.) Plaintiff's direct reports were not "adhering to treatment planning guidelines" and Plaintiff failed to update treatment records by the deadline set forth in the December 29 memo of concern. (Id.)

On February 14, 2020, in response to the disciplinary action, Plaintiff submitted a grievance via email to Gathura, with Latella copied. (Pl. Dep., 134:21–24); (MSJ, Ex. I, "Official Grievance Request.") Plaintiff disputed that he failed to provide adequate support and training to direct

reports. He explained that the performance issues raised related to a specific unit were due to a lack of support and a program coordinator not being assigned to the unit. (MSJ, Ex. I, "Official Grievance Request.") Plaintiff did not raise the issue of race or discrimination in this email. (Id.)

On March 27, 2020, after reviewing the disciplinary action, Latella responded to the grievance with a memo, concluding that the reasons for the disciplinary action were credible but that the level of the action would be reduced to a verbal warning. (Id.); (MSJ, Ex. J, "Response to Grievance, 3/27/2020.")

On or about March 30, 2020, Vincent provided Plaintiff with an Annual Performance Review. (MSJ, Ex. K, "Annual Performance Review.") In all categories, Plaintiff received ratings that corresponded to "Expected" or "Better than Expected." (Id.) Plaintiff received an overall rating of "7" out of "10" which was the highest rating in the "Expected" category. (Id.); (Resp. to SOF at ¶ 54.) In the comments, the Annual Performance Review noted that Plaintiff needed to "mitigate issues" that related to "scheduling and Standard Operating Procedures across residences on caseloads," "learn and manage treatment planning workflow and regulatory guidelines by applying himself, learning the workflow and being hands on," and provide timely staff evaluations. (MSJ, Ex. K, "Annual Performance Review"); (Pl. Dep., 142:6–12, 143:3–17.) In his self-assessment, Plaintiff acknowledged that there were still some issues with maintaining timely records of treatment planning. (MSJ, Ex. K, "Annual Performance Review"); (Pl. Dep., 147:9–21.)

A compliance audit took place on June 6, 2020. On July 7, 2020, Vincent issued a written warning to Plaintiff because a compliance audit revealed discrepancies in treatment planning and record management for his caseload. The audit also further revealed that Plaintiff's direct reports were not following the treatment planning workflow. (MSJ, Ex. L, "Record of Disciplinary Action,

7/7/2020.") Plaintiff was instructed to correct the compliance issues by June 30, 2020. (Id.) A second compliance audit was conducted on July 6, 2020 and again showed that Plaintiff's direct reports continued to be non-compliant. (Id.) Plaintiff received a written warning which reiterated the job expectation for a Program Director and stressed the importance of ensuring that all direct reports maintain accurate treatment records in compliance with regulatory timelines. (Id.) The written warning included "Corrective Action," namely, that Plaintiff needed to "review all the discrepancies in the client records and provide a weekly progress report on the record for each caseload," and it directed that all discrepancies be resolved by July 15. (Id.) The written warning noted that further infractions "will result in disciplinary action up to and including termination." (Id.)

After the July 7 written warning, Vincent received one progress update from Plaintiff which "outlin[ed] a further training date for one of the managers." (Id.) A compliance audit was completed on July 17, 2020 and revealed that the compliance issues had "taken a turn for the worse" and various treatment plans and quarterly reviews were overdue. (Id.) On July 20, 2020, Vincent issued a final written warning to Plaintiff. (MSJ, Ex. M, "Record of Disciplinary Action, 7/20/2020.") The final written warning included "Corrective Action," specifically, that Plaintiff needed to ensure listed items were compliant by July 31, 2020 and submit weekly progress reports to Vincent. (Id.) Vincent testified that he issued the final written warning because Plaintiff "just wasn't making any progress after numerous discussions" and as a result, clients were negatively impacted. (Vincent Dep., 90:11–91:1.)

On July 27, 2020, Plaintiff submitted a grievance in response to the July 7 and July 20 disciplinary actions via email to Gathura and Latella. (MSJ, Ex. N, "Grievance Request-Kyle Carter.") Plaintiff explained that compliance issues were due to both a lack of support and technical

issues. (Id.) Plaintiff stated that the ASD program directors also had direct reports that were non-compliant but the other two directors were not disciplined. (Id.) On August 4, 2020, Gathura followed-up with a memo upholding the final written warning. (MSJ, Ex. P, "Response to Grievance, 8/4/2020.")

### F.  Plaintiff's Termination

On August 5, 2020, Defendant terminated Plaintiff's employment. (MSJ, Ex. Q, "Termination Letter.") The termination letter stated that Plaintiff was fired due to violations of Defendant's treatment planning policies and because Plaintiff failed to improve after multiple disciplinary actions. (Id.) Vincent testified that he recommended Plaintiff's termination "[b]ecause he was not meeting the performance expectation." (Vincent Dep., 104:13–22.)

In the days after his termination, Plaintiff sent a letter to Defendant's national office. (MSJ, Ex. R, "Letter to the National Office.") Plaintiff's letter raised several issues including the lack of support provided to IDMH, problems with Vincent, safety concerns, and racially insensitive comments made by McNellis. (Id.)

## II.   PROCEDURAL HISTORY

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). On July 27, 2021, he received a right to sue letter from the EEOC. On October 8, 2021, Plaintiff filed suit setting forth claims of race discrimination and retaliation under Title VII of the Civil Rights Act ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). (Compl. at ¶¶ 41–60.) Following discovery, Defendant moved for summary judgment on all claims.

On November 30, 2023, I held oral argument, during which I asked Plaintiff's counsel to focus on how Plaintiff had met his burden in establishing a prima facie case of employment

discrimination. Thereafter, the parties submitted additional letter briefs augmenting their respective positions on whether Plaintiff has met his burden in showing a prima facie case and establishing pretext. (ECF Nos. 29 and 30.)

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015). The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment is appropriate if the non-moving party provides merely colorable, conclusory or speculative

evidence. <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252. Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. <u>Versarge v. Twp. of Clinton</u>, 984 F.2d 1359, 1370 (3d Cir. 1993). Moreover, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 241 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)). "The party opposing summary judgment, whether pro se or counseled, must present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial." <u>Watson v. Philadelphia Hous. Auth.</u>, 629 F. Supp. 2d 481, 485 (E.D. Pa. 2009) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)).

## IV.  DISCUSSION

Plaintiff alleges two causes of action under Title VII and the PHRA. First, Plaintiff claims that he was discriminated against because he was terminated for having non-compliant direct reports, while similarly situated Caucasian managers also had non-compliant direct reports but were not terminated. Second, Plaintiff claims that he was wrongfully terminated in retaliation for complaining about the allegedly discriminatory treatment between his program and the program led by Caucasian directors.

With respect to the race discrimination claim, Defendant maintains that no reasonable jury could find that Plaintiff's race was the reason for his termination, or that Defendant's justifications for terminating him were pretextual.  As to the retaliation claim, Defendant argues that Plaintiff fails to establish that he engaged in protected activity, or that such an activity was the reason for his termination. For the reasons set forth below, I find that Plaintiff has failed to establish a <u>prima facie</u> case of discrimination or retaliation and cannot sufficiently point to evidence of pretext.

A.      **Race Discrimination**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Plaintiff's race discrimination claim relies on the same burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411, U.S. 792 (1973).[2]

To establish a claim of race discrimination under Title VII, a plaintiff-employee must first establish a prima facie case. Jones v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999); McDonnell Douglas Corp., 411 U.S. 792. To establish a prima facie case of race/national origin discrimination, a plaintiff must show that he: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. Jones,198 F.3d at 410–11; Warfield v. SEPTA, 460 F. Appx 127, 129-30 (3d Cir. 2012).[3]

---

[2]      Race and national origin-based discrimination claims brought under Title VII and the PHRA are both analyzed under the same McDonnell Douglas burden-shifting scheme. See Jones v. School Dist. of Phila., 198 F.3d 403, 410–11 (3d Cir. 1999) (applying the *McDonnell Douglas* framework to a claim of race discrimination under Title VII); Bartlett v. Kutztown Univ., No. 13-cv-4331, 2015 WL 766000, at *8 n.12 (E.D. Pa. Feb. 23, 2015) (noting that the analysis for adjudicating discrimination claims under the PHRA is identical to that of a Title VII inquiry). Because Plaintiff's race/national origin claims are based on the same conduct and analyzed under the same framework, I shall consider them together.

[3]      Where a Plaintiff has direct evidence of discrimination—i.e., overt or explicit evidence that directly reflects a discriminatory bias that is causally related to the adverse employment decision—he or she need not rely on the McDonnell Douglas framework.  Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004).  Plaintiff here does not claim to have any such direct evidence of discrimination.

If a plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action suffered by the plaintiff. McDonnell Douglas Corp., 411 U.S. at 802. If defendant meets this burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that any proffered justifications are pretextual and that the real reason for the employer's conduct was prohibited discrimination. Id. at 802-804.

1. Circumstances Giving Rise to an Inference of Discrimination

A factfinder may infer that discrimination was a proximate cause of an adverse employment outcome because either (a) similarly situated persons who are not members of the protected class were treated more favorably, or (b) the adverse employment outcome arose under circumstances that give rise to an inference of unlawful discrimination. Warfield, 460 F. Appx at 129-30. "Similarly situated" employees need not be "identically situated," but "must nevertheless be similar in all relevant respects." Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222-23 (3d Cir. 2009). See also In re Trib. Media Co., 902 F.3d 384, 403 (3d Cir. 2018) ("To meet her burden of demonstrating that another employee is similarly situated, a plaintiff must show that there is someone who is directly comparable to her in all material respects.") (internal citation and quotations omitted). Which factors are relevant is a context-specific question, but the analysis often includes a demonstration that the two employees dealt with the same supervisor, were subject to the same standards, and engaged in the same type of conduct allegedly justifying the adverse outcome without such circumstances as might justify differential treatment. Opsatnik, 335 F. App'x at 223. A comparator's conduct must be of "comparable seriousness." Id. at 223 (internal citation omitted). The focus of the inquiry into allegedly unfavorable treatment is "on the particular criteria or qualifications identified by the employer as the reason for the adverse action."

14

<u>Warfield</u>, 460 F. App'x. at 130 (relying on <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 646 (3d Cir. 1998)).

The crux of Plaintiff's claims is that two of his Caucasian colleagues, Fusco and Gonzalez, also had non-compliant subordinates, however, neither were disciplined or terminated for compliance issues. For the purposes of this analysis, it is important to first highlight that in January 2020, Gonzalez was replaced by Thetford, an African-American woman. (Pl. Dep. 76:18–77:19.) From January 2020 to August 2020, therefore, one of Plaintiff's counterparts in the ASD program was of his same race. Accordingly, Plaintiff's assertion that Fusco and Gonzalez were treated preferentially based on their race is, therefore, only applicable to the period between April 2019 to January 2020.

It is undisputed that Fusco, Gonzalez, and Plaintiff all had the same job title, had similar job responsibilities, and reported to Vincent. (Vincent Dep., 12:12–24, 13:16–19, 16:20–24.) However, the parties dispute whether Fusco and Gonzalez are similarly situated comparators because Defendant claims they did not engage in the same conduct as Plaintiff. Defendant persuasively points out that Plaintiff was terminated because he failed to provide proper oversight to his subordinates for almost a year, resulting in non-compliant reporting. (Vincent Dep. 73:2–91:1.). And Plaintiff offers little proof of Fusco's and Gonzalez's allegedly similar deficient conduct—only a single email that he wrote to HR, in which he claims he had conversation(s) with Fusco and Gonzalez where they told him that they also had subordinates with late compliance items. (SOF Ex. N, "Grievance Request-Kyle Carter.") Thus for several reasons detailed below, I conclude that Plaintiff has not demonstrated that a reasonable jury could find that he has established a <u>prima facie</u> case of racial discrimination.

15

First, Plaintiff's recounting of comments allegedly made by Fusco and Gonzalez are hearsay. "Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." <u>Smith v. City of Allentown</u>, 589 F.3d 684, 693 (3d Cir. 2009). Plaintiff points to no independent evidence establishing that either Fusco or Gonzalez had similar alleged deficient employment issues. Rather, Plaintiff offers Fusco and Gonzalez's statements through an email that he himself authored. Thus, for the comment to be considered at the summary judgment stage, Plaintiff must demonstrate that both layers of hearsay, Fusco and Gonzalez's statements and the email itself, would be admissible at trial. <u>See</u> Fed.R.Evid. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule . . .").

Plaintiff has failed to do so. Despite holding oral argument and providing Plaintiff an additional opportunity to point to admissible evidence of record that supports his <u>prima facie</u> case, Plaintiff has not addressed the hearsay issue or presented any direct, admissible statements by Fusco or Gonzalez (e.g. deposition or affidavit) regarding whether their alleged compliance issues were similar to Plaintiff's.

Second, Plaintiff's deposition testimony directly conflicts with his email claiming Fusco and Gonzalez told him they also had non-compliant direct reports. Specifically, Plaintiff testified that he was not aware of Fusco or Gonzalez having any performance issues. (Pl. Dep. 203:9–204:23.) He further stated that other than the allocation of resources between the IDMH and ASD programs, he did not believe that Fusco and Gonzalez were treated more favorably than he was. (<u>Id.</u> at 204:6-11.) And Vincent testified in his deposition that he was not aware of Fusco or Gonzalez having performance issues or having non-compliant subordinates. (Vincent Dep. 112:8–17.) Therefore, the record does not reflect that Fusco and Gonzalez were similarly situated

comparators because their conduct was not of "comparable seriousness" to Plaintiff's. <u>Opsatnik</u>, 335 F. App'x at 222–23.

 Third, even if I could consider Plaintiff's assertion that Gonzalez and Fusco had one or two program managers with late compliance items, Plaintiff has not established that their behavior rises to the same level of severity for which he was disciplined. (SOF Ex. N, "Grievance Request-Kyle Carter.") Having non-compliant direct reports was just one of several reasons cited by Defendant in its decision to terminate Plaintiff. And Plaintiff fails to provide evidence that his fellow program directors' alleged compliance issues violated Defendant's client treatment planning policy or were serious enough to warrant disciplinary action. Because Plaintiff cannot establish that his Caucasian colleagues engaged in the same conduct that prompted his termination, he has failed to point to similarly situated comparators who received preferential treatment to satisfy the fourth element of his <u>prima facie</u> case. <u>Warfield v. SEPTA</u>, 460 F. App'x 127, 129–30 (3d Cir. 2012).

 Finally, Plaintiff fails to identify facts in the record to support his contention that his termination arose under circumstances giving rise to an inference of discrimination. A factfinder may draw an inference of discrimination if the record suggests that an otherwise unexplained adverse action was more likely than not based on impermissible considerations. <u>Pivirotto v. Innovative Sys.</u>, 191 F.3d 344, 352 (3d Cir. 1999); <u>see also</u> <u>Equal Emp. Opportunity Comm'n v. Metal Serv. Co.</u>, 892 F.2d 341, 348 (3d Cir. 1990) (holding that under the fourth element, a plaintiff can satisfy his burden by presenting evidence upon which a "court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons").

 In support of his "inference" claim, Plaintiff alleges that his program, which had predominantly African-American clients, received fewer client resources, namely, games, and less

staffing support than the program led by the Caucasian directors with predominantly Caucasian clients. (Resp. to MSJ at 5.) The assertion that resources were allocated between the two programs based on the racial makeup of the clients does not establish a claim of race discrimination under Title VII. Plaintiff has cited no cases in support of this proposition. The plain text of Title VII demonstrates the intent for the adverse employment action to be directly related to the employee's own race:

> It shall be an unlawful employment practice for an employer--
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race

42 U.S.C. § 2000e-2(a) (emphasis added). In short, Plaintiff fails to connect the dots between alleged racially motivated resource disparities between the programs and his termination.

Plaintiff further points to a general feeling he had that there was a "racial component" to Fusco and Gonzalez being treated better than he was. (Pl. Dep. 203:16-19.) In support Plaintiff references comments made by Executive Director McNelis during a meeting that protestors in Philadelphia should not be rioting or looting and later sent out an email about "providing support to those affected by the racial unrest by directing them to foodbanks." (SOF at ¶ 49.)

The Third Circuit Court of Appeals has made clear that "[s]peculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." Paradoa v. Philadelphia Hous. Auth., 610 F. App'x 163 (3d Cir. 2015). When considering whether stray remarks are probative of discrimination, the Court considers three factors: (1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the purpose and content of the statement; and (3) the temporal proximity of the statement to the adverse employment decision." Stites v. Alan Ritchey, Inc., No. 09-cv-392, 2011 WL 81076, at *8 (E.D. Pa. Jan. 10, 2011), aff'd, 458 F. App'x 110 (3d Cir. 2012).

18

Plaintiff fails to articulate how these offhand comments could give rise to an inference of discrimination. McNelis did not refer to Plaintiff specifically, did not mention his race, and there is no evidence of record connecting these comments with decisions to terminate Plaintiff. It is well-established that "[w]here other evidence of discrimination is lacking, stray remarks by nondecision makers are too isolated to show independently that unlawful discrimination, rather that the defendant's asserted lawful reason, caused the adverse action." Stone v. West River Group, No. 18-cv-1640, 2022 WL 4472470, at *11 (M.D. Pa., 2022) (citing Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)). As Plaintiff has failed to cite to any evidence of racial discrimination, other than his own unsubstantiated and speculative beliefs, a reasonable jury could not find that discrimination was a proximate cause of Plaintiff's termination.

    2.  Pretext

Even assuming Plaintiff was able to establish a prima facie case, his claim would still not survive summary judgment because he cannot point to sufficient evidence to rebut Defendant's proffered justifications for terminating his employment and establish that these reasons were pretextual.

To establish pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Because Defendant has offered a "legitimate, nondiscriminatory" justification for Plaintiff's employment, the burden shifts to Plaintiff to prove that a jury could find by a preponderance of the evidence that the proffered justifications are pretextual. Jones, 198 F.3d at 410. To meet his burden, Plaintiff must "present evidence contradicting the core facts put forward

by the employer as the legitimate reason for its decision." <u>Kautz v. Met–Pro Corp.</u>, 412 F.3d 463, 467 (3d Cir. 2005). "A plaintiff may not establish pretext by simply showing that the employer's decision was wrong or mistaken." <u>Robinson v. Matthews Int'l Corp.</u>, 368 F. App'x 301, 304 (3d Cir. 2010). Instead, he must show there is "a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons, which can be done by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions that allow a reasonable factfinder to find the [employer's] reasons unworthy of credence." <u>Brennan v. City of Philadelphia</u>, 856 F. App'x 385, 386 (3d Cir. 2021) (internal citations and quotations omitted).

Defendant has proffered evidence that Plaintiff was terminated because he was not meeting performance expectations and that he violated Defendant's "Client Treatment Planning policy." The undisputed record demonstrates Plaintiff was disciplined multiple times for failing to meet performance goals and was aware that failure to fulfill the job requirements would result in termination. (Resp. to SOF at ¶¶ 11, 13, 29, 31, 33.)

In response, Plaintiff first contends that Defendant has provided inconsistent reasons for his termination. Plaintiff takes issue that his termination letter stated that he was terminated for violating the "Client Treatment Planning policy," while Vincent testified in his deposition that Plaintiff was terminated for performance issues. But these two reasons are not plainly contradictory. Plaintiff acknowledges that one of his job responsibilities was to oversee direct reports. (Pl. Dep. 60:24–62:2.) Plaintiff repeatedly failed to ensure the compliance of his direct reports and, as a result, was disciplined multiple times over the course of eight months. It was Plaintiff's failure to ensure that his employees complied with internal processes that resulted in a formal violation of Defendant's client treatment policy. Though Plaintiff's termination letter and

20

Plaintiff's supervisor did not use the exact same language, the reasons for Plaintiff's termination are consistent enough such that no issue of material fact exists.

Second, Plaintiff points out that his annual performance review on March 30, 2020 establishes that he was, at the very least, meeting performance expectations. Plaintiff argues that termination for performance issues five months after a favorable performance review "simply does not make sense" and, therefore, gives rise to an inference of discrimination. (Resp. to MSJ at 7.)

The Third Circuit has consistently held that past positive performance reviews, without more, do not establish pretext. See Kautz, 412 F.3d at 474 ("The attempt to use past positive performance reviews to show that more recent criticism was pretextual fails as a matter of law."); see also Ezold, 983 F.2d at 528 ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations."). Further, when an employer relies on a performance-related event that takes place after an employee is given a satisfactory performance review to justify terminating that employee, pretext is more difficult to establish. See Oliver v. Clinical Practices of Univ. of Pennsylvania, 921 F.Supp.2d 434, 450 (E.D. Pa. Feb. 4, 2013) ("[T]he fact that Plaintiff's supervisors had lauded her customer service skills in the past does not, in itself, preclude a finding that Plaintiff's conduct towards a particular patient on September 8, 2008 was severe enough to warrant termination."); Lassiter v. Children's Hosp. of Philadelphia, 131 F. Supp. 3d 331, 347-48 (E.D. Pa. 2015) ("While CHOP's decision to continually provide positive reviews to an underperforming employee may have been imprudent, the Court's role is not to determine whether the employer made the best or even a sound business decision, but whether the real reason [for the adverse action] is discrimination.") (internal quotations and citations omitted).

Here, several performance-related events occurred between the March 2020 performance review and Plaintiff's termination in August, which Defendant cites in its reasons for firing Plaintiff. Three compliance audits, conducted in June and July 2020, revealed that Plaintiff's job performance had not improved. The June 6, 2020 audit revealed that there were discrepancies in client records, and Plaintiff was ordered to correct them by June 30, 2020. The July 6, 2020 audit showed he did not make the corrections and they were to be resolved by July 15, 2020. The July 17, 2020 audit revealed the corrections were not made and that treatment plans and reporting were overdue. Plaintiff was subsequently issued a final written warning, wherein he had to submit weekly updates to Vincent through July 31, 2020. The satisfactory performance review Plaintiff received in March, taken in light of these three audits, cannot serve as the basis for establishing pretext.

Moreover, Plaintiff does not contest the facts underlying Defendant's justifications for his termination. Defendant alleges that Plaintiff's master treatment plans and quarterly reviews were overdue or missing, he neglected to file progress notes for clients, client files were missing core clinical record documents, and client records were not thinned. (SOF Ex. L, "Record of Disciplinary Action, 7/7/2020.") Defendant provided Plaintiff with deadlines to meet compliance requirements and he failed to do so on multiple occasions. (SOF Ex. H, "Record of Disciplinary Action, 2/7/2020"); (SOF Ex. L, "Record of Disciplinary Action, 7/7/2020.") In his grievances, Plaintiff does not dispute the fact he had compliance issues and was aware that termination was a possible result if he did not improve. (SOF Ex. I, "Official Grievance Request"); (SOF Ex. N, "Grievance Request-Kyle Carter.")

Considering the totality of the circumstances, including Plaintiff's past disciplinary history, significant feedback and various improvement plans, and the June and July 2020 audits, I

find that a reasonable juror would be unable to conclude that Plaintiff's past satisfactory performance review establishes a finding of pretext. Accordingly, without more, his past positive performance review argument fails as a matter of law. Because Plaintiff has not made out a <u>prima facie</u> case of race discrimination, and further has not pointed to sufficient evidence of pretext, Plaintiff's race discrimination claim fails as a matter of law and Defendant's motion for summary judgment as to this claim will be granted.

### B.       Retaliatory Termination

Title VII bars employers from engaging in race discrimination or retaliating against employees who report an instance of race discrimination. <u>Moore v. City of Phila.</u>, 461 F.3d 331, 341 (3d. Cir. 2006). Plaintiff's retaliation claim relies on the same burden-shifting framework set forth in <u>McDonnell Douglas Corp.</u>, 411, U.S. 792. To establish a <u>prima facie</u> case of retaliation under Title VII and the PHRA, a plaintiff-employee must show that: (1) they engaged in activity protected by Title VII, (2) the defendant-employer subsequently took an adverse employment action against them, and (3) their protected activity was the but-for cause of the alleged adverse action. <u>Kengerski v. Harper</u>, 6. F.4th 531, 537 (3d Cir. 2021); <u>Univ. of Tex. Southwestern Med. Ctr. v. Nassar</u>, 570 U.S. 338, 362 (2013). The parties agree that Plaintiff's termination constitutes an adverse employment action. Accordingly, only the first and third elements are at issue.

"[P]rotesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct." <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1085 (3d Cir. 1996). To prove that their conduct constitutes protected activity, a plaintiff must show that they did more than complain generally about unfair treatment, but instead complained specifically about unlawful discrimination. <u>Barber v. CSX Distrib. Servs.</u>, 68 F.3d 694, 702 (3d Cir. 1995). "[C]omplaints must be specific enough to notify management of the particular type of

discrimination at issue in order to constitute 'protected activity.'" Sanchez v. SunGard Availability Servs. LP, 362 F. App'x 283, 288 (3d Cir. 2010) (citing Barber, 68 F.3d at 702).

"[C]omplain[ts] about unfair treatment in general and express[ions] [of] ... dissatisfaction" that "do[] not specifically complain about ... discrimination" are not protected. Barber, 68 F.3d at 701-702; Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006). "In considering what activities constitute protected conduct, [the Third Circuit has] emphasize[d] that anti-discrimination employment statutes are not intended to establish general standards for conduct of employers in dealing with employees." Daniels v. School Dist. of Philadelphia, 776 F.3d 181, 195 (3d Cir. 2015).

Plaintiff claims that he engaged in a protected activity when he complained about other program directors being treated more favorably than him. In his February 14, 2020 and July 27, 2020 grievance emails to Gathura and Latella, Plaintiff raised concerns about the lack of support for the IDMH program and alleged the ASD program directors were treated differently.[4] (SOF Ex. N, "Grievance Request-Kyle Carter"); (SOF Ex. I, "Official Grievance Request.") In his July 27, 2020 grievance email, Plaintiff stated:

> I reached out to several of the other Program Directors (ASD). Despite having multiple TM's (two in particular) that were also late with their compliance items (some 90+ days and one TM from ASD that is habitually late), neither PD had EVER been written up by ED for it. This lack of consistency with accountability is alarming to say the least.

(SOF Ex. N, "Grievance Request-Kyle Carter"). Nowhere in his grievance does Plaintiff reference race discrimination, or even mention the topic of race at all. And, as noted previously, at the time

---

[4]     Plaintiff also argues that his complaints in a letter to the national office, sent after his termination, constitutes protected activity. Retaliatory motive cannot be inferred since Plaintiff made these comments to the national office after the adverse employment action.

he sent this email, one of the program directors, Thetford, was African-American. (Pl. Dep., 76:14–77:19.) Given the foregoing, Plaintiff failed to demonstrate that he complained specifically about unlawful discrimination. His complaint about general unfair treatment, therefore, is not protected activity under Title VII. Barber, 68 F.3d at 702.

Plaintiff also claims that he engaged in protected activity when he complained about the ASD program receiving more staffing support and resources than his program. Plaintiff alleges he complained to Vincent and an unnamed employee from Defendant's national office in September 2019 (Pl. Dep. 90:3–92:21, 96:10–97:22.) Plaintiff has provided very little information about what exactly he said to Vincent and this unnamed employee but alleges in his deposition that he told them that he believed the programs were treated differently because of the racial demographics of the clients.

As a threshold matter, I must determine whether Plaintiff's complaints about alleged inequities based on race between the ASD and IDMH programs amount to protected activity under Title VII. Plaintiff opposed alleged disparities between the ASD and IDMH programs, which he attributes to the race of the clients. Plaintiff has provided no legal authority to support his position that making complaints about resource allocation among Defendant's various programs constitutes protected activity. However, viewing all facts in the light most favorable to Plaintiff as the non-moving party, a fact finder could possibly find that Plaintiff had a good faith belief that complaining about resource allocation among the two programs was a protected activity because he allegedly told Vincent that he believed the allocation was based on the racial makeup of the clients. See Aman, 85 F.3d at 1085.[5]

---

[5] Plaintiff's complaint about McNellis' comments is not protected activity because it is not reasonable for Plaintiff to believe these offhand comments violate Title VII. See Clark County School Dist. v. Breeden, 532 U.S. 268, 270 (2001). As addressed in Section IV.A of this

However, Plaintiff cannot demonstrate causation. To make out a prima facie case that his firing was retaliatory, Plaintiff must show that there is a causal connection between his protected activities and his termination. Moore, 461 F.3d at 340-41. Plaintiff can demonstrate causation "[w]here the temporal proximity between the protected activity and the adverse action is unusually suggestive." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (internal quotations and citation omitted). He can also prove causation "[w]here the temporal proximity is not unusually suggestive, we ask whether the proffered evidence, looked at as a whole, may suffice to raise the inference." Id. (internal quotations and citation omitted). Further, I am reminded that "[a] plaintiff asserting a claim of retaliation has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination under Title VII." Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 257–58 (3d Cir. 2017).

"Although there is no bright line test of temporal proximity, the Third Circuit generally considers days, not months, usually suggestive." Cameron-Satchell v. CDHA Mgmt. LLC, 2021 WL 4902342, *14 (E.D. Pa. Oct. 21, 2021) (internal quotations and citation omitted) (collecting cases). Here, the chronology does not create an issue of fact. According to Plaintiff's deposition testimony, he complained of disparities between the programs to Vincent in September and October 2019, and to an unnamed person at the national office later that fall. (Pl. Dep. 91:2-96:12.) Plaintiff was terminated almost a year later in August 2020. Viewing the timing of the complaints in the light most favorable to Plaintiff, a complaint made in late fall 2019 would have been made nine months prior to his termination. Such timing, without more, cannot be considered unusually suggestive of discrimination. See Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir.

---

memorandum opinion, the comments were not directed toward Plaintiff, did not mention his race, and were not connected to the adverse employment action.

2003) (finding that a period of three weeks between Plaintiff engaging in a protected activity and being terminated is not unusually suggestive).

Further, in viewing the evidence as a whole, I find that a reasonable juror would be unable to infer that Plaintiff's complaints to Vincent and an unnamed person in the national office in the fall of 2019 were the cause of his termination. As detailed above, Defendant documented Plaintiff's performance deficiencies for almost eleven months and provided him with performance improvement plans, furnished written and verbal feedback as to his adherence to those plans, and gave him written and verbal warnings when he did not improve. Defendant conducted three audits in the summer of 2020, all of which revealed that Plaintiff's compliance reporting was not improving. I find that Plaintiff has not pointed to evidence "sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse employment action." Carvalho-Grevious, 851 F.3d at 253. (emphasis in original) (internal citations and quotations omitted). Given the totality of the circumstances, I find that Plaintiff's retaliation claim fails as a matter of law and Defendant's motion will be granted.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff has not demonstrated that he was terminated because of his race.  He also has not shown that Defendant's decision to terminate him was in retaliation for any race-based complaints. Accordingly, Plaintiff's claims fail as a matter of law and I will grant summary judgment in favor of Defendant.

An appropriate Order follows.